Argued and submitted April 16, 1999, reversed and remanded July 26, 2000

In the Matter of the Compensation of
James E. Clemons, Claimant.

ROSEBURG FOREST PRODUCTS,
*Petitioner,*

*v.*

James E. CLEMONS,
*Respondent.*

(97-00968; CA A101296)

9 P3d 123

Charles E. Bolen argued the cause for appellant. With him on the brief was Hornecker, Cowling, Hassen & Heysell.

Benton Flaxel argued the cause for respondent. With him on the brief was Flaxel & Nylander.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

## KISTLER, J.

Employer Roseburg Forest Products (employer) seeks review of an order of the Workers' Compensation Board affirming an administrative law judge's (ALJ) award of scheduled and unscheduled disability for claimant's accepted claim of "left-sided sciatica." We reverse and remand.

In May 1996, claimant experienced pain and numbness along the left posterior lateral thigh, calf, and foot while driving a forklift at work. Dr. Brazer examined claimant and diagnosed left-sided sciatica. Brazer prescribed rest and anti-inflammatories, and the condition improved within a few days. Brazer recommended that claimant have an MRI to rule out a herniated disc. The MRI showed no significant disc bulging or herniation, and an x-ray showed mild degenerative changes in claimant's back. After the MRI, Brazer diagnosed "left sciatica with no evidence of disk herniation."

On June 5, 1996, claimant saw Dr. Keizer, an orthopedist, and reported a continuation of leg symptoms and pain in his low back. Keizer diagnosed "mild degenerative osteoarthritis of the lumbar spine, symptomatic." Claimant had some physical therapy, and his condition began to improve. Claimant also underwent an independent medical examination, and the diagnosis was sciatica and mild degenerative disc disease. On June 18, 1996, Dr. Bert, claimant's attending physician, examined claimant and diagnosed "mild sciatica, resolving." Bert released claimant for work on June 24, 1996.

On October 14, 1996, employer accepted a claim for "left-sided sciatica," and also closed the claim with an award for temporary total disability but without an award of permanent disability. Claimant sought reconsideration, objecting to the impairment findings used to rate his disability. Dr. Smith, a medical arbiter, was asked to describe "any objective findings of permanent impairment **resulting from the <u>accepted injury</u>**" including ranges of motion and muscle strength. (Boldface and underscoring in original.) In his report, the arbiter noted "slight loss of strength of inversion and eversion of the left ankle and foot estimated at 4+/5. The

nerve root involved is L5." The arbiter also noted that range-of-motion measurements did not meet the American Medical Association's (AMA) validity requirements but concluded that "the measurements themselves are accurate and could be used to determine impairment."

Based on the arbiter's report, the Department of Consumer and Business Services awarded scheduled disability for claimant's loss of foot strength and unscheduled disability for his loss of range of motion. On review by the hearings division, the ALJ affirmed the award of scheduled disability, reasoning that the foot disability was a "medical sequel[a]" to the original accepted condition of "left-sided sciatica" and was therefore compensable under ORS 656.268(16) (1997).[1] In affirming the award of unscheduled disability, the ALJ relied on the opinion of the medical arbiter as to loss of range of motion. The Board affirmed the ALJ, accepting with supplementation the ALJ's order.

■ Employer contends initially that because claimant did not specifically assert an entitlement to scheduled permanent partial disability for loss of left foot strength in his request for reconsideration, the Department lacked jurisdiction to consider the matter. We reject that contention. The Board has long held that, in the reconsideration process, the Department is not limited to deciding only those issues raised by the parties but must make its award based on the evidence before it. *Darlene K. Bentley,* 45 Van Natta 1719, 1799 (1993). That view reflects a correct understanding of the Department's obligation under ORS 656.268(5) and (6) (1997),[2] to examine the medical and vocational reports and

---

[1] ORS 656.268(16) (1997) provided:

"Conditions that are direct medical sequelae to the original accepted condition shall be included in rating permanent disability of the claim unless they have been specifically denied."

[2] ORS 656.268(5) and (6) (1997) provided, in part:

"(5)(a) Within 10 working days after the department receives the medical and vocational reports relating to an accepted disabling injury, the claim shall be examined and further compensation, including permanent disability award, if any, determined under the supervision of the Director of the Department of Consumer and Business Services. If necessary the department may require additional medical or other information with respect to the claim, and may postpone the determination for not more than 60 additional days.

"* * * * *

award further compensation, if appropriate. Unlike ORS 656.268(8), relating to the hearing process, ORS 656.268(5) and (6) (1997) contain no restriction on the Department's authority to consider issues not raised by the parties. The Board did not err in determining that the Department could consider and award benefits for claimant's scheduled disability.

■     On the merits, employer asserts, among other issues, that its acceptance did not encompass the conditions for which the Board awarded scheduled and unscheduled permanent disability. The scope of employer's acceptance is a question of fact. See *Granner v. Fairview Center*, 147 Or App 406, 935 P2d 1252 (1997). We discuss first the scheduled disability award for the left foot. The foot weakness was first measured and noted by the medical arbiter, who also was of the opinion that the cause of claimant's left foot weakness is the nerve root involvement at L5. The ALJ said that, in the absence of a specific denial of L5-S1 nerve root injury, the question was whether the foot weakness was a direct medical sequela of the accepted sciatica. Relying on the explanation provided by the independent medical examiners, the ALJ said that sciatica

"is a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity along its posterior or lateral aspect. The term also refers to pain anywhere along the course of the sciatic nerve. *Dorland's Medical Dictionary* (27th ed 1988). The sciatic nerve is a bundle of nerves which travels through the buttock and down the back of the thigh before splitting at the knee."

---

"(6)(a) Notwithstanding any other provision of law, only one reconsideration proceeding may be held on each determination order or notice of closure. However, following a request for reconsideration pursuant to subsection (5)(b) of this section by one party, the other party or parties may file a separate request. At the reconsideration proceeding, the worker or the insurer or self-insured employer may correct information in the record that is erroneous and may submit any medical evidence that should have been but was not submitted by the physician serving as the attending physician at the time of claim closure.

"(b) If necessary, the department may require additional medical or other information with respect to the claims and may postpone the reconsideration for not more than 60 additional calendar days."

The ALJ found that, although only the medical arbiter had measured the foot weakness, there was other medical evidence of a neurological disturbance in the lower leg. She concluded that employer had failed to carry its burden of proof under ORS 656.283(7)[3] to negate a relationship between the accepted sciatica and the neurological symptoms in the foot.

■   The same medical report on which the ALJ relied for the definition of sciatica explains that a diagnosis of sciatica can, but need not, involve the nerve root, *i.e.*, the place of origin of the sciatic nerve in the low back. As that medical report explained, symptoms of sciatica can occur at any point along the nerve, including in the foot after the nerve splits at the knee. Employer's acceptance is for "left-sided sciatica." The scope of an acceptance is an issue of fact, which we review for substantial evidence. ORS 183.482(8). We conclude that the medical report, which explains that a diagnosis of sciatica can involve symptoms at any point along the nerve, constitutes substantial evidence to support the Board's finding that claimant's neurological symptoms, including his foot weakness, were a part of the accepted condition.

■   The final issue is whether the Board could use range-of-motion findings that did not meet AMA validity criteria to determine claimant's unscheduled permanent partial disability. Smith took a series of measurements to determine claimant's range of motion. He reported that "[t]he relationship between total sacral motion and straight leg raising does not meet the AMA validity requirements." He concluded, "Despite this, I believe that the measurements themselves are accurate and could be used to determine impairment."[4]

---

[3] ORS 656.283(7) provides, in part:

"[N]othing in this section shall be construed to prevent or limit the right of a worker, insurer or self-insured employer to present the reconsideration record at hearing to establish by a preponderance of that evidence that the standards adopted pursuant to ORS 656.726 for evaluation of the worker's permanent disability were incorrectly applied in the reconsideration order pursuant to ORS 656.268."

[4] According to an interpretative bulletin issued by the Workers' Compensation Division, the AMA guidelines provide that "reproducibility of abnormal motion is currently the only known criterion for validating optimum effort. The examiner must take at least three consecutive measurements of mobility which must fall within plus or minus ten percent or five degrees (whichever is greater) in order to be consistent." Workers' Compensation Bulletin No. 242, at 2 (Feb 1, 1995). The

The ALJ ruled that Smith's measurements could be used even though they did not comply with the AMA validity requirements. She explained:

"Dr. Smith administered the test only three times rather than the allowable six times. That may be explained by his conclusion that despite the fact that the AMA validity requirements were not met, his measurements were accurate and usable for determining impairment * * *. Following promulgation of OAR 436-035-0007(27) which became effective February 17, 1996, that appears to be sufficient. *Justeen L. Parker*, 49 Van Natta 334, 335 (1997).

"In order to be insufficient under the governing rule for rating permanent disability, even though the doctor acknowledges that the measurements do not comply with AMA standards, they are to be used to rate impairment unless the physician 'provides a written opinion, based on sound medical principles, explaining why the findings are invalid.' OAR 436-035-0007(27). Without that explanation, the measurements are technically adequate for purposes of rating permanent disability."

The Board adopted the ALJ's reasoning.

■      On review, employer argues that the Board misinterpreted OAR 436-035-0007(27) (1996). That rule provided:

"Validity shall be established for findings of impairment according to the criterion noted in the **AMA Guides to the Evaluation of Permanent Impairment, 3rd Ed., Rev., 1990,** unless the validity criterion for a particular finding is not addressed in this reference or is not pertinent to these rules. Upon examination, findings of impairment which are determined to be ratable pursuant to these rules shall be rated unless the physician determines the findings are invalid and provides a written opinion, based on sound medical principles, explaining why the findings are invalid.

---

bulletin also states that "measurements of true lumbar flexion are invalid if the tightest straight leg raising (SLR) angle is not equal to or within 10 degrees of the sum of the lumbar extension and flexion measured at midstream." *Id.* at 7.

In this case, Smith took three consecutive measurements of various movements. Those measurements appear to meet the first AMA criterion for validity. Smith reported, however, that his measurements did not meet the second criterion. Neither the parties nor the Board discusses whether the failure to meet the second criterion invalidates all or only some of Smith's findings of impairment.

When findings are determined invalid, the findings shall receive a value of zero."

OAR 436-035-0007(27) (1996) (boldface in original).[5] The question the rule presents is how the standard for validity set out in the first sentence relates to the determination whether a finding of impairment is ratable, which the second sentence contemplates. Employer argues that the rule does not permit the Board to rate findings of impairment that are not valid under the AMA criteria; in other words, a determination that a finding of impairment is valid under the AMA criteria is a necessary prerequisite to a determination that the finding is ratable. Claimant urges us to adopt the Board's interpretation of the rule.[6] Under that interpretation, the fact that a finding of impairment is not valid under the AMA criteria is immaterial to the question whether it is ratable. Rather, as the ALJ explained, findings of impairment "are to be used to rate impairment unless the physician 'provides a written opinion, based on sound medical principles, explaining why the findings are invalid.' "

Claimant's interpretation is at odds with the text of the rule. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 612 n 4, 859 P2d 1143 (1993) (methodology for statutory construction applies to administrative rules). Under claimant's interpretation, a finding of impairment that is not valid under the AMA criteria is presumed to be ratable unless the physician provides a written opinion explaining why the finding is invalid. It is difficult, however, to understand why the rule would specify a criterion for determining when findings of impairment are valid and then direct that that criterion be ignored unless the physician has instructed otherwise. Claimant's interpretation would effectively read the first sentence out of the rule.

---

[5] The rule was amended in 1997, but the amended rule does not apply to this claim because the claim was closed before the amended rule's effective date. OAR 436-035-0003(1).

[6] The rule was promulgated by the Workers' Compensation Division of the Department of Consumer and Business Services. Because the Board was not interpreting its own rule, we do not defer to its interpretation. *See Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994).

Employer's interpretation fits more closely with both the text and context of the rule. Under its interpretation, validity under the AMA is a necessary, but not the only, prerequisite for determining that a finding of impairment is "ratable." That interpretation gives effect to the first sentence in the rule. It is also consistent with the phrase, "determined to be ratable *pursuant to these rules*," in the second sentence. (Emphasis added.) As that phrase makes clear, the question whether a finding of impairment is ratable is not limited to the question whether it is valid under the AMA criteria. Rather, other rules may require consideration of additional factors in determining whether a finding of impairment is ratable. *See, e.g.*, OAR 436-035-0007(2)(a) (1996) (when there is a superimposed condition, "[o]nly the portion of those findings that are due to the compensable condition shall receive a value"); OAR 436-035-0350(2) (1996) (specifying how subsequent surgeries on vertebrae should be rated).

■　　Although the text and context of the rule fit better with employer's position than claimant's, we cannot say that the text and context are unambiguous. The parties have not identified any legislative history that would shed light on the rule's meaning, and we are aware of none. We are thus left to maxims of construction, but those maxims do not provide a clear answer. Employer's interpretation produces an incongruity but not an absurdity.[7] *Cf. Young v. State of Oregon*, 161 Or App 32, 38, 983 P2d 1044 (1999) (explaining role of the "absurd result" maxim). Claimant's interpretation, on the other hand, effectively reduces the first sentence in the rule to a nullity; if claimant were correct, validity would not be established by the AMA criteria, contrary to the explicit statement in the rule. We conclude that the better answer is to interpret the rule in a way that will not reduce an integral part of the rule to a nullity and that fits more closely with both the text and context of the rule. *See* ORS 174.010; *State*

---

[7] If a determination that findings are ratable requires a determination that findings are valid under the AMA criteria, then the second sentence permits a physician to explain why findings that do comply with AMA criteria are nonetheless invalid, but the rule does not permit a physician to explain why findings that do not comply with AMA criteria are nonetheless valid. We note that the rule has since been amended to permit a physician to explain why a finding of impairment that does not comply with the AMA criteria is nonetheless valid. That amendment, however, does not apply to this case. *See* n 5 above.

*v. Cook*, 163 Or App 578, 586, 989 P2d 474 (1999). We accordingly hold that under OAR 436-035-0007(27) (1996), if a finding of impairment does not comply with the AMA criteria, it may not be used to rate a claimant's impairment. We reverse the Board's order and remand for further proceedings consistent with this decision.

Reversed and remanded.